NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | Civil Action No.: 11-2479 (JLL) |
| Plaintiff, |  |
| v. | **OPINION** |
| MILLENNIUM TELECARD, INC., et al., |  |
| Defendants. |  |

**LINARES**, District Judge.

This matter comes before the Court by way of Plaintiff's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, brought by way of Order to Show Cause. The Plaintiff in this matter is the Federal Trade Commission ("FTC"). Defendants, Millennium Telecard, Inc., Millenium Tele Card, LLC, Coleccion Latina, Inc., Telecard Center USA, Inc., and Fadi Salim (referred to collectively as "Defendants"), are engaged in the business of prepaid calling cards. The FTC brings this enforcement action under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), seeking to obtain, <u>inter alia</u>, temporary, preliminary and permanent injunctive relief, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief based on allegations that Defendants have engaged in deceptive marketing of prepaid calling cards in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). The Court has considered the submissions made in support of and in opposition to the instant motion. A hearing in connection with Plaintiff's motion was held before the undersigned on May 16, 2011. Based on the reasons that follow, Plaintiff's application is granted in part.

1

## FACTUAL AND PROCEDURAL BACKGROUND

**A.     Plaintiff's Complaint**

The FTC, an independent agency of the United States Government created by statute, initiated this action on May 2, 2011 by filing a Complaint for Permanent Injunction and other equitable relief and an ex parte motion for a Temporary Restraining Order against the various Defendants to this matter.  Defendants have been engaged in the business of prepaid calling cards since at least 2002 (Compl., ¶ 20).  Defendant Salim is the founder, president and/or CEO of the various corporate Defendants.

In short, Plaintiff's Complaint alleges that Defendants engaged in deceptive marketing of prepaid calling cards in violation of the Federal Trade Commission Act, 15 U.S.C. § 41, et seq.  In particular, the FTC maintains that Defendants "have deceived and continue to deceive consumers, many of whom are recent immigrants, by: (1) misrepresenting the number of calling minutes consumers will obtain using Defendants' prepaid calling cards; and (2) failing to disclose or disclose adequately fees that have the effect of reducing the number of calling minutes available to consumers using Defendants' prepaid calling cards." (Compl., ¶ 1).  The FTC further alleges that "[i]n numerous instances since at least 2007, the calling minutes actually delivered to consumers by Defendants' prepaid calling cards are substantially fewer than what is promised by Defendants in marketing, advertising and promoting their cards." (Compl., ¶ 39).  In support of this position, the FTC points to the fruits of its own investigation wherein it determined that "[i]n 141 tests of Defendants' cards conducted between August 24, 2010 and March 30, 2011, Defendants' cards delivered an average of only 45% of the advertised minutes.  Of the 141 tested cards, 139 – more than 98% – failed to deliver the number of minutes advertised on the point-of-sale posters." (Compl.,

¶ 40).

Count One of Plaintiff's Complaint alleges deception by way of misrepresentations regarding the number of calling minutes, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Count Two of Plaintiff's Complaint alleges deception by virtue of failure to disclose fees, also in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

**B.     Plaintiff's Ex Parte Motion for a Temporary Restraining Order**

In conjunction with its Complaint, the FTC filed, on May 2, 2011, an ex parte motion for a temporary restraining order pending this Court's decision on its motion for a preliminary injunction. Plaintiff's application for a temporary restraining order was granted on the same day. In its May 2, 2011 Order, this Court found, preliminarily, that "there is good cause to believe that Defendants . . . have engaged in and are likely to engage in acts and practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by deceptively marketing prepaid telephone calling cards, and the FTC is therefore likely to prevail on the merits of this action." (May 2, 2011 Order, ¶ 2). This Court's May 2, 2011 Temporary Restraining Order directed, inter alia, certain conduct prohibitions, an asset freeze, disclosure by Defendants of various financial records and statements, preservation of records, prohibition of release of customer information, and the appointment of a temporary Receiver. (Docket Entry No. 5).

Such Order was entered on an ex parte basis based upon the sworn certification submitted by Kathleen Daffan, counsel for the FTC, wherein she represented that there is ample evidence demonstrating that "it is reasonably likely that Defendants will destroy documents and dissipate or

hide assets" absent the ex parte relief requested.  (Docket Entry No. 3-2).  Such evidence also included a sworn certification by an investigator for Bank of America stating that Mr. Salim bounced three (3) checks (drawn from his personal E*Trade account and deposited into a Millennium corporate account) in or around November 2009.  See Starr Decl., ¶ 9, Pl. Ex. 154.  No bond was posted by the FTC in accordance with Federal Rule of Civil Procedure 65(c).

## LEGAL STANDARD

A preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted." Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).  Traditionally, in order to obtain preliminary injunctive relief, the moving party must demonstrate: (1) the likelihood of eventual success on the merits; (2) the existence of immediate irreparable harm if the relief requested is not granted; (3) that a balance of the hardships weighs in its favor; and (4) that consideration of the public interest weighs in favor of granting the relief requested. Ortho Pharm. Corp. v. Amgen, Inc., 882 F.2d 806, 812-13 (3d Cir. 1989).

However, in the specific context of actions brought by the FTC, several courts of appeals have held that the FTC need not satisfy the traditional equity standard that courts typically impose on private litigants to justify imposition of a preliminary injunction, but must instead demonstrate the following: (1) the likelihood that it will ultimately succeed on the merits, and (2) that a balance of the equities weighs in favor of granting the relief requested. See F.T.C. v. Univ. Health, Inc., 938 F.2d 1206, 1217-18 (11th Cir. 1991); FTC v. Warner Comm'cs Inc., 742 F.2d 1156, 1160 (9th Cir. 1984); FTC v. Food Town Stores, Inc., 539 F.2d 1339, 1343-44 (4th Cir. 1976); see generally FTC v. Check Investors, Inc., No. 03-2115, 2003 U.S. Dist. LEXIS 26941, at *13 (D.N.J. July 30, 2003)

(noting that "the traditional factors are not applicable when, as in this case, a federal agency is

seeking injunctive relief that is authorized by statute.").  Section 13(b) of the FTC Act itself provides

that "[u]pon a proper showing that, weighing the equities and considering the [FTC]'s likelihood of

ultimate success, such action would be in the public interest . . . a preliminary injunction may be

granted . . . ." 15 U.S.C. §53(b).  In light of the foregoing, and absent a contrary directive from the

Court of Appeals for the Third Circuit, the Court will apply this standard to Plaintiff's application.

## DISCUSSION

### A.      Likelihood of Success on the Merits

Plaintiff's Complaint asserts two claims of deception under Section 5(a) of the FTC Act, 15

U.S.C. § 45(a).  Section 5(a)(1) declares unlawful "[u]nfair methods of competition in or affecting

commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45.  "The

primary purpose of § 5 is to lessen the harsh effects of caveat emptor."  FTC v. Freecom Commc'ns,

Inc., 401 F.3d 1192, 1202 (10th Cir. 2005).  To establish liability under section 5 of the FTC Act,

the FTC must establish: "(1) there was a representation; (2) the representation was likely to mislead

customers acting reasonably under the circumstances, and (3) the representation was material." FTC

v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003).  A material omission can also violate section 5

of the FTC Act. See, e.g., Sterling Drug, Inc. v. FTC, 741 F.2d 1146, 1154 (9th Cir. 1984) ("The

failure to disclose material information may cause an advertisement to be deceptive, even if it does

not state false facts.").  In order to establish liability under Section 5(a), the FTC need not prove that

the misrepresentation or omissions were made with the intent to deceive or in bad faith.  See

Freecom Commc'ns,, 401 F.3d at 1202.  Nor does the FTC need to show actual reliance by consumers.  See FTC v. Verity Intern., Ltd., 443 F.3d 48, 63 (2d Cir. 2006) ("[I]t is enough that the representations or practices were likely to mislead consumers acting reasonably.").  "Instead, the 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer." Freecom Commc'ns,, 401 F.3d at 1202.

The FTC claims that Defendants have committed two forms of deception: (1) falsely representing the number of minutes consumers will receive when using Millennium calling cards, and (2) failing to disclose (or adequately disclose) the fees associated with Millennium cards.  In addition, the FTC claims that Defendants, together, constitute a "common enterprise" for purposes of rendering them jointly and severally liable for the foregoing violations of the FTC Act.

The crux of Defendants' opposition to the FTC's application is that the FTC is unlikely to succeed on the merits because it has failed to establish that the conduct at issue – under both claims – constitutes "deceptive marketing" within the meaning of the Act.  Defendants also offer two more generalized arguments in opposition to Plaintiff's motion.  For instance, Defendants maintain that the FTC is unlikely to succeed on the merits because: (1) the Federal Communications Commission ("FCC"), not the FTC, has exclusive jurisdiction over the issues raised in Plaintiff's Complaint, and (2) the voluntary payment doctrine renders the government incapable of demonstrating that Millennium's customers were deceived.   For purposes of ease and efficiency, the Court will first address the more global arguments raised by Defendants concerning the FTC's jurisdiction to bring this action (or lack thereof) as well as the implications, if any, of the voluntary payment doctrine to the FTC's claims.

6

### 1.      FTC's Jurisdiction

15 U.S.C. § 45(a)(2) provides that "the Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except . . . common carriers subject to the Acts to regulate commerce . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." In this regard, Defendants maintain, generally, that "[a]s distributors of the cards, defendants have absolutely no ability to set the rate structure or fee structure for the calls, which is within the exclusive province of the service providers [or common carriers]. Regulation of the service providers, in turn, is within the exclusive jurisdiction of the Federal Communications Commission ("FCC"). (Def. Br. at 1). See 15 U.S.C. § 45(a)(2). It follows – according to the Defendants – that any action as to the amount of the applicable fees or the rates imposed will necessarily involve the service carriers (or common carriers) over which the FTC does not have jurisdiction. See id. Thus, the crux of Defendants' argument is not that the FTC lacks jurisdiction to bring  this action; rather, Defendants argue that the FTC lacks jurisdiction over a hypothetical action that Defendants believe would more appropriately serve the ultimate goal of protecting consumers from the rate/fee structure at issue in this matter – that is, an action against the service providers (or common carriers) who actually set the fee/rate structure. Although Defendants' point is well taken, it has no bearing on whether the FTC has jurisdiction to bring the instant enforcement action against a calling card distributor. Nothing stated or cited to by Defendants suggests that it does not.[1] Defendants' argument in this regard is therefore rejected.

---

[1] To the extent Defendants argue that the Court should construe distributors (or retailers) like Millennium as agents or employees of the common carrier, Defendants cite to no legal authority in support of this position. Moreover, Defendants admit that they are not carriers and/or providers. (Salim Cert., ¶¶ 7-9) ("Contrary to the suggestion of the FTC, it is calling card providers (also referred to as carriers), not distributors of calling cards like MTC, that are in

### 2.      Voluntary Payment Doctrine

Defendants maintain that the FTC is unlikely to succeed on the merits of its claims of deception by virtue of the voluntary payment doctrine.  The "voluntary payment doctrine is a corollary to the mistake of law doctrine and, in its general formulation, holds that a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution." Randazzo v. Harris Bank Palatine, N.A.,  262 F.3d 663, 667 -668 (7th Cir. 2001).

Defendants argue that the voluntary payment doctrine precludes the FTC's claims of deception inasmuch as the consumers at issue in this matter purchased the calling card products after becoming aware of the alleged misrepresentations and supposed hidden fees. (Def. Br. at 13). Defendants cite to no case law applying the voluntary payment doctrine in the context of an enforcement action brought by the FTC.   To the contrary, as previously stated,"[t]he primary purpose of § 5 [of the FTC Act] is to lessen the harsh effects of caveat emptor."  Freecom Commc'ns, 401 F.3d at 1202 ("Such rule 'can no longer be relied upon as a means of rewarding fraud and deception and has been replaced by a rule which gives to the consumer the right to rely upon representations of facts as the truth.").  Thus, without more, Defendants have failed to demonstrate that the voluntary payment doctrine should be applied in the context of an FTC enforcement action, the primary purpose of which is to protect the consumer public.

### 3.      The FTC's Claims of Deception

Count One of Plaintiff's Complaint alleges deception by way of misrepresentations regarding the number of calling minutes, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  In

---

control of and responsible for [inter alia] . . .  imposing fees or costs that reduce calling time").

support of this claim, the FTC relies on the results of an investigation it conducted between August 24, 2010 and March 30, 2011.  Dani Stagg, an investigator with the FTC, testified to the following:

> Of the 141 cards tested, 139 cards or 98.58% failed to deliver the number of minutes advertised in the corresponding point of sale posters.  On average, the 141 tested cards delivered only 45.06% of the minutes advertised on point of sale posters.  Thirty of the 141 delivered less than 25% of the advertised minutes.  Furthermore, nine cards delivered less than 10% of the advertised minutes, and the worst card failed to deliver any minutes.

Stagg Decl., ¶ 32, Pl. Ex. 151.  Thus, The FTC maintains that Defendants' express representations concerning the number of minutes contained on a calling card have been proven false by virtue of the FTC's testing and are likely to mislead reasonable consumers. See generally Am. Home Prods. Corp. v. FTC,  695 F.2d 681, 687 (3d Cir. 1982) ("[T]he tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context") (quotation omitted).

Count Two of Plaintiff's Complaint alleges deception by virtue of failure to disclose fees that reduce the value of the cards, also in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). In support of this claim, the FTC argues that any disclosures and/or curative language must be sufficiently prominent and unambiguous such that the overall net-impression of the communication becomes non-deceptive.  See, e.g., Removatron Intern. Corp. v. FTC, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").  The FTC maintains that the disclaimers on Millennium's cards

9

and posters "are so minuscule as to be nearly illegible, and certainly make very little impression compared with the large, colorful claims about the number of minutes a consumer will receive when calling particular destinations." (Pl. Br. at 25-26). Moreover, the FTC claims that even consumers who see, read and try to understand the disclaimers contained on Millennium's posters and/or cards "have no way of knowing which fees apply, when they apply or the amount of the actual fee." (Pl. Br. at 26).

Defendants, on the other hand, argue that the FTC has failed to establish that the conduct at issue constitutes "deceptive business practices" within the meaning of the FTC Act for two reasons: (1) as to Count 2 , failure by the FTC to rely on actual consumer experiences in order to support its conclusion that the fees at issue are deceptive, and (2) as to Count 1, failure by the FTC to take into account the implication of the fees on the total number of minutes available on the card when conducting its testing and/or concluding that the cards tested misrepresented the number of minutes available. See generally Tr. (May 16, 2011) at 33:25-35:8. Stated differently, Defendants maintain that Plaintiff has failed to demonstrate likelihood of success as to Count 1 because their testing does not address the relevant issue – that is, whether the cards provide the number of minutes one would expect after all applicable fees are applied. See id. Because the Court determines, based on the reasons that follow, that the FTC has demonstrated likelihood of success on the merits as to Count 2 – deception by virtue of failure to adequately disclose fees that reduce the value of the calling cards – the Court need not determine whether the testing upon which Plaintiff relies in support of Count 1 took into account – in whole or in part – the implication of all applicable fees in reducing the number of minutes available.

10

a.   **Count Two – Deception by Virtue of Failure to Adequately Disclose Fees that Reduce the Value of the Calling Cards**

As previously stated, Count 2 alleges deception by virtue of failure to disclose (or adequately disclose) fees that reduce the value of the calling cards in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).   Defendants oppose the FTC's motion as to this claim on the basis that the FTC failed to rely on actual consumer experiences in order to support its conclusion that the fees at issue are deceptive.   In particular, Defendants argue as follows:

> The government cites no legal basis (and . . . cites no actual consumer experiences) for the assertion that MTC's cards and the disclosures contained on those cards are 'deceptive business practices' but instead reaches that conclusion all on its own.   Whether a finder of fact would reach the same conclusion, or whether the finder of fact would determine that MTC's disclosures are sufficient is not at all clear.   Such a weak claim should never form the basis for a request for injunctive relief, particularly where the relief sought is extremely onerous.

(Def. Br. at 14).   Thus, as a preliminary matter, the Court notes that Defendants do not expressly dispute that the FTC has otherwise satisfied the elements for establishing liability under Section 5 of the FTC Act as to Count 2 – namely, that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." FTC v. Tashman, 318 F.3d at 1277.   Moreover, the Court agrees, as a general matter, that any representations by Defendants (on their calling cards or other point-of-sale materials) concerning the number of calling minutes available or the fees that may be applied so as to reduce the number of calling minutes would be material under the circumstances.

Turning back to Defendants' argument concerning the FTC's failure to substantiate its allegations of deception with actual consumer experiences, in response, the FTC maintains that such

11

evidence is unnecessary given that the Court, acting as the fact finder, can look at the disclaimers contained on the calling cards and make a preliminary determination about whether such disclaimers are sufficiently prominent and unambiguous to avoid liability under section 5.  See Tr. (May 16, 2011) at 20:3-14.   The Court agrees with the FTC that when considering its  request for a preliminary injunction, the Court is required to make preliminary findings of fact to determine whether or not the relevant factors weigh in favor of granting the equitable relief requested.  See, e.g., Imaging Business Machines, LLC. v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006) ("In considering the motion for preliminary injunction, the district court could assess the likelihood that Imaging Business Machines' evidence would be persuasive to a fact-finder in light of BancTec's evidence."); Burlington Northern R. Co. v. Bair, 957 F.2d 599, 605 (8th Cir. 1992) ("The district court, as fact-finder under the 4-R Act, should consider evidence from both parties before deciding whether to grant a preliminary injunction."); East Portland Imaging Center, P.C. v. Providence Health Sys. – Oregon, No. 05-465, 2006 WL 752590, at *5 (D. Or. March 21, 2006) (recognizing that, procedurally, the court acts as the fact finder in ruling on a motion for a preliminary injunction); Cabot Corp. v. King, 790 F. Supp. 153, 156 (N.D. Ohio 1992) (same).  Accordingly, the Court finds Defendants' argument concerning the FTC's failure to substantiate its claim of inadequate disclosure of fees with consumer experiences to be unpersuasive.

Thus, the sole issue remaining before the Court is whether the FTC has met its burden of demonstrating – albeit, preliminarily – that Defendants' calling cards and/or other point-of-sale materials are deceptive under Section 5. Because it is undisputed that the fees imposed reduce the number of minutes actually available (and advertised) on the card, the Court will begin its analysis with the presumption that Defendants' representation concerning the number of minutes available

12

would likely mislead the ordinary consumer absent an adequate disclaimer explaining exactly how such fees will be imposed and thus reduce the number of minutes advertised. See, e.g., FTC v. Tashman, 318 F.3d at 1277.  As previously stated, the 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer." Freecom Commc'ns,, 401 F.3d at 1202.  "Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." Removatron Intern. Corp. v. FTC, 884 F.2d 1489, 1497 (1st Cir. 1989).

The Court has closely reviewed the disclaimer contained on Millennium's "Pan Caliente" poster and/or calling card – as a sampling of the fee disclosure used by Defendants on their calling cards and other point-of-sale materials – which provides:

> PROMPTED MINUTES ARE AVAILABLE WHEN USED ON A SINGLE CALL PLACED ONLY FROM A LOCAL ACCESS NUMBER. At the end of each connected call, all of the following fees CAN REDUCE the number of available minutes remaining as well as the value of the card: (1) a post call duration charge of up to $0.49; (2) a maximum service fee of $0.05 per minute (in addition to the base rate per minute).  In addition, the following fees will ALSO REDUCE the number of available minutes, as well as the value of the card: (1) a $0.79 fee applied on the first day of use and every 7 days thereafter; (2) a $0.02 additional fee per minute applied to calls made via toll free access numbers and/or $0.99 additional fee when using the toll free access from a payphone.  Minutes and/or seconds are billed in three minute increments.  Please call our customer service number at 1-800-479-9352 for updates on our current rates.  Cards have no cash value and are not returnable or exchangeable. Card expires three (3) months after first use. The prepaid calling service provider is SCT and their twenty four (24) hour customer service number is 1-800-479-9352. NOTE THAT different per minute rates, charges or fees may apply to calls to and from international telephone

numbers, international cellular and international wireless telephone numbers.

Pl. Ex. 62.  Based on the following reasons, the Court finds that the FTC has demonstrated likelihood of success on the merits as to Count 2 – deception by virtue of failure to disclose (or adequately disclose) fees that reduce the value of the calling cards in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

First, the disclaimer provides that the number of minutes advertised are available only when the card is used "on a single call placed only from a local access number" but fails to define or otherwise provide any guidance as to what is meant by "a local access number."  The disclaimer also provides that "minutes and/or seconds are billed in three-minute increments."  The Court finds that this statement is ambiguous and inadequately explained.  Finally, the disclaimer provides that "different per minute rates, charges or fees may apply to calls to and from international telephone numbers . . . ."  Again, the Court finds this statement to be confusing particularly given that: (1) Defendants' calling cards are marketed as international calling cards,[2] (2) the sentence does not explain what "different" (and/or additional) fees would or could be applied for international calls or the circumstances that would trigger such fees, and (3) the sentence is preceded by an extensive list of circumstances triggering various fees that may – by virtue of this sentence – be inapplicable to international calls all together.

In light of the foregoing, the Court finds that the FTC has demonstrated likelihood of success on the merits as to Count 2.  In particular, the Court finds that the statements contained in Defendants' disclaimer are not sufficiently unambiguous to leave an accurate impression as to the

_____

[2] See Pl. Ex. 61.

specific circumstances under which the various fees will be imposed thereby reducing the number of minutes available.  To the contrary, the Court finds that an ordinary consumer, upon reading said disclaimer in conjunction with the number of minutes otherwise advertised on the card, would be left with little or no idea as to which fees will apply, the circumstances that would trigger such fees and therefore the number of minutes that will, in fact, be available for their use.  Because the Court finds that statements contained on Defendants' calling cards and/or posters are likely to mislead ordinary consumers,[3] the FTC has satisfied its burden of demonstrating that it will likely succeed on the merits as to Count 2. See, e.g. FTC v. Affordable Media, 179 F.3d at 1233.

### C.    Existence of Common Enterprise and Imposition of Individual Liability

Among the various forms of relief sought, the FTC seeks to maintain an asset freeze over Defendant Salim's personal E*Trade account.  The FTC's request is based upon two theories: (1) that Defendants, together, constitute a "common enterprise" for purposes of making them jointly and severally liable for the violations of the FTC Act, and (2) that Defendant Salim should be held individually liable for the acts of the corporate defendants.

"When determining whether a common enterprise exists, courts look to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through "a maze of interrelated companies," unified advertising, and evidence which 'reveals that no real distinction existed between the Corporate Defendants' " FTC v. Wolf, 1996 WL 812940, at * 7 (S.D. Fla. Jan. 31, 1996) (internal citations omitted).   Evidence contained in the record demonstrates, preliminarily, that the corporate defendants are commonly controlled by Fadi Salim,[4]

---

[3]  See, e.g., FTC v. Verity Intern., Ltd., 443 F.3d at 63.

[4]  See Stagg Decl., Pl. Ex. 151, ¶¶ 34, 37,  Tables 3 and 4.

share overlapping corporate addresses,[5] engage in unified advertising with shared trademarks and

brands,[6] and commingle corporate funds.[7]   Moreover, the Court notes that Defendants do not

expressly dispute the existence of a common enterprise.  In light of the foregoing, the Court finds

that Plaintiff has met its burden of demonstrating – preliminarily – the likelihood of success on the

merits as to its claim that Defendants, together, comprise a common enterprise such that they may

be held jointly and severally liable for any injury caused by virtue of their violations of the FTC Act.

As to Salim's individual liability, "[a]n individual will be liable for corporate violations of

the FTC Act if (1) he participated directly in the deceptive acts or had the authority to control them

and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity

of the misrepresentation, or was aware of a high probability of fraud along with an intentional

avoidance of the truth."  FTC v. Stefanchik, 559 F.3d 924, 931 (9th Cir. 2009).  Thus, as a general

matter, an individual may be liable for the acts of a corporation where the individual had "actual

knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a

misrepresentation, or had an awareness of a high probability of fraud along with an intentional

avoidance of the truth." FTC v. Publishing Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir.

1997).  However, "the FTC is not required to show that a defendant intended to defraud consumers

in order to hold that individual personally liable." Id.

Defendants do not dispute that, as founder and sole principal of each of the corporate

defendants, Defendant Salim directly participated in all central aspects of Millennium's business and

_____

[5]  Id.

[6]  Id.

[7]  See, e.g., Stagg Decl., ¶ 54, Table 7; Stagg Decl., ¶ 56, Table 8.

16

had the ability to control Millennium.  Morever, Salim specifically admits that Millennium's service providers control its rates/fees,[8] that TCN is one of Millennium's main service providers, and that he was responsible for operating TCN's day-to-day business.[9]  In light of the foregoing, and given that Defendant Salim does not expressly dispute – at this juncture – that he can be held personally liable for the acts of the corporate defendants, the Court finds, preliminarily, that Defendant Salim was at least recklessly indifferent with regard to the deceptive nature of Millennium's phone cards or posters and can thus be held individually liable for any injunctive and/or monetary liability imposed on the Millennium Defendants.


2.     **Balance of the Equities**

The Court must now determine whether the FTC has met its burden of demonstrating that a balance of the equities in this matter weighs in favor of granting the injunctive relief sought.  In this regard, the FTC argues that the balance of equities mandates entry of a preliminary injunction because "the public interest in preventing consumers from falling victim to defendants' deceptive marketing far outweighs any possible interest defendants may have in continuing to operate their business deceptively." (Pl. Br. at 27).

Defendants, on the other hand, maintain that the balance of equities weighs in favor of the removal or amendment of the restraints currently in place because it is so broadly worded and all-

---

[8] See Salim Cert., ¶ 9 ("The information as to the number of minutes of initial calling time . . . is not determined by MTC but is provided to MTC by the prepaid calling service providers.").

[9] See Salim Cert., ¶ 11 (TCN then took over SUNCOAST's accounts and became the service provider on [Millennium's] calling cards.  TCN is owned by a former MTC employee.  I am responsible for operating TCN's day-to-day business.").

encompassing that it will: (1) damage the very customers the FTC purports to protect, (2) damage the wholesalers from whom Millennium purchases its products, and (3) prevent Defendants from properly defending themselves in this action.  Moreover, Defendants maintain that the continued appointment of a Receiver will irreparably damage, if not completely destroy Millennium.  Finally, Defendants urge the Court to amend the injunction currently in place so as to allow Mr. Salim to have access to his personal assets; according to the Defendants, the Government's concerns can be addressed through a much narrower injunction that allows for the monitoring of Mr. Salim's assets and an injunction against the expatriation of assets.

The Court agrees that, as a general matter, public equities receive greater weight than private equities.  See, e.g., FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1030 (7th Cir. 1988) ("Although private equities may be considered, public equities receive far greater weight.") (quoting FTC v. Warner Commc'ns Inc., 742 F.2d 1156, 1165 (9th Cir.1984)).  That being said, the Court agrees with Defendants that the consideration of private equities – particularly in the context of this case, its procedural history, and the specific proofs shown by the FTC herein – should be carefully weighed by this Court in determining whether the restraints currently in place should be continued or modified in whole or in part.  See, e.g., FTC v. Nat'l Tea Co., 603 F.2d 694, 697 n. 4 (8th Cir. 1979) ("In light of the statute's purpose to protect the public-at-large, rather than individual private competitors, courts must properly emphasize the public equities. However, we do not think that it was the intention of the statute's drafters to totally shield from judicial view the private equities which may merit inclusion in the courts' equitable overview.").

The Court's May 2, 2011 TRO directed, inter alia, certain conduct prohibitions, an asset freeze, disclosure by Defendants of various financial records and statements, preservation of records,

18

prohibition of release of customer information, and the appointment of a temporary Receiver. (Docket Entry No. 5). The real dispute lies with three aspects of the temporary restraints currently in place: (1) the curative language to be used on Millennium's calling cards and/or posters going forward, (2) the asset freeze, and (3) the appointment of a Receiver. The Court will now consider whether the continuation of such temporary measures is warranted.


### A.    Language Used on Calling Cards

Having found Defendants' calling cards and/or other point-of-sale materials deceptive by virtue of failure to adequately disclose the fees that reduce the value of the cards, the Court finds that a balance of the equities certainly weighs in favor of continuing the "Conduct Prohibitions" imposed by way of this Court's May 2, 2011 TRO, in its entirety. Such "Conduct Prohibitions" are hereby incorporated by reference. See May 2, 2011 Order at 9-11 ("Conduct Prohibitions"). In short, Defendants are preliminarily enjoined from making or assisting others in making any material misrepresentation, either expressly or by implication, including but not limited to, a misrepresentation concerning the Talk Minutes and/or applicable per minute rates. See id. In addition, Defendants are preliminarily enjoined from failing to make clear and prominent disclosure of all material limitations on the specific value of their calling cards, including but not limited to, the existence and amount of all fees or charges of any type that may be imposed. See id. Defendants do not, as a general matter, expressly oppose the continuation of such prohibitions.

In fact, it is the Court's understanding that, in an effort to continue its business operations in a manner that complies with this Court's May 2, 2011 TRO, Defendants have ceased using the disclosure at issue in this motion and, with the assistance of the Receiver, are utilizing a new

19

disclosure which they maintain is compliant with the dictates of this Court's May 2, 2011 TRO. To date, no specific language has been provided for the Court's consideration and/or approval. Accordingly, in the interest of fairness, the Court will allow both parties to submit proposed language for the Court's consideration on or before July 25, 2011. The Court requests that the Receiver file a recommendation concerning the parties' proposals on or before July 28, 2011. To be clear, the Court's potential approval of any language to be used by the Millennium Defendants at this time is preliminary in nature and is subject to modification in whole or in part once the record in this matter has been fully developed.

### B.     Asset Freeze and Appointment of Receiver

According to the FTC, "where, as here," defendants have defrauded members of the public and are likely to dissipate assets, an asset freeze and appointment of a temporary receiver are appropriate." (Pl. Br. at 34). Because the FTC relies on largely the same proofs for both of the remedies sought, the Court will consider both requests in conjunction with one another.

This Court's May 2, 2011 TRO temporarily froze all of Millennium's corporate assets as well as Defendant Salim's personal assets. See May 2, 2011 Order at 11-13. The Court's May 2, 2011 TRO also appointed Nicholas R. Amato as temporary receiver for the Defendants. In his capacity as Receiver, Mr. Amato was directed to, among other things: (1) assume full control of Millennium, (2) take exclusive custody and possession of all assets and/or documents under Defendants' control, (3) take all steps necessary to secure and take exclusive custody of each location from which Millennium operates, (4) conserve, hold and manage all of Defendants' assets and perform all acts necessary to preserve the value of those assets in order to prevent any irreparable loss or damage

thereto, (5) manage and administer Defendants' business, (6) take all steps necessary to ensure that any of Defendants' marketing materials are modified so as to be in compliance with the Federal Trade Commission Act, and (7) suspend Millennium's business operations if in his judgment such operations could not be continued legally and profitably. See May 2, 2011 Order at 20-25.

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009). By way of example, some courts have found it appropriate to impose an asset freeze in the following types of situations: (1) where defendant had convinced his fellow directors and trustees to consent to diverting nearly $35 million from the company's account into his personal bank account,[10] and (2) where defendant had a history of making intra-family transfers and had refused to disclose asset information in defiance of court order.[11]

The appointment of a Receiver is a well-established equitable remedy available in instances in which the corporate defendant, through its management, has defrauded members of the public. See, e.g., SEC v. First Financial Group of Texas, 645 F.2d 429, 438 (5th Cir. 1981) ("It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief.") (quotation omitted). In determining whether a Court-appointed Receiver is necessary, the "prima facie showing of fraud and mismanagement is enough

---

[10] See Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009).

[11] See Connecticut General Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 881 (9th Cir. 2003).

to call into play the equitable powers of the court." Id. (quoting SEC v. Keller Corp., 323 F.2d 397, 403 (7th Cir. 1963)).

In support of its request for an asset freeze and/or appointment of a temporary Receiver, the FTC points to the following acts of financial impropriety by Millennium and/or Salim:

1.  The underlying deceptive conduct.

2.  Three checks (totaling $390,000.00) written in 2009 by Salim from his personal E*Trade account and deposited into a Millennium corporate account were returned due to insufficient funds. Security Investigator from Bank of America, N.A. characterized such activity to be of a "check kiting nature because the uncollected balance was used to support the payment of various check expenses for Millenium." (Staar Decl., Pl. Ex. 154).

3.  Salim's history of commingling corporate and personal funds. For instance, the FTC points out that, since 2001, Millennium and Salim purchased and became co-owners of six cars, Salim has used Millennium's corporate bank accounts to make payments and repairs on his luxury vehicles and from January 2010 through February 2011, Salim received $2.24 million in wire transfers and wrote himself over $2.5 million in checks from Millennium's Bank of America accounts. (Pl. Exs. 141, 142, 150, 151).

4.  Salim received almost $5 million in "unsystematic infusions" of Millennium funds between January 2010 and February 2011. (Pl. Exs. 141, 151 (Table 8)).

5.  Salim's history of writing large checks to "cash" from Millennium accounts. (Pl. Exs. 143, 144) (containing copies of two (2) checks written to "cash" totaling approximately $430,000.00).

6.  Salim wired approximately $40,000 from his United States account to an HSBC account located in Syria. (Pl. Exs. 157-158, 163). Salim was admittedly in Syria at the time of this transfer. (Pl. Ex. 159).

7.  Kathleen Daffan, counsel for the FTC, submitted a declaration stating that: (a) there is ample evidence (as listed above) demonstrating that "it is reasonably likely that Defendants will destroy documents and dissipate or hide assets" absent the asset freeze requested, and (b) "it has been the Commission's experience," in the context of similar enforcement actions, that defendants like Salim "often attempt to undermine the FTC's efforts to preserve the status quo by immediately dissipating or concealing assets".

(Docket Entry No. 3-2).

In light of the totality of circumstances, as set forth above, the FTC urges the Court to continue the asset freeze and appointment of a temporary Receiver without which "there is no check on Mr. Salim's ability to completely drain Millennium and any personal funds that would otherwise be available for consumer redress." (Pl. Reply at 13).

Defendants, on the other hand, maintain that no assets should be frozen, and certainly none of Mr. Salim's personal assets should be frozen (including but not limited to his personal E*Trade account and his real estate properties). In support of this position, Defendants point out that despite their one year long investigation, the Government has only been able to provide the Court with a single incident of "financial impropriety" – that is, the three bounced checks from 2009. Defendants maintain that none of the other pieces of evidence introduced by the FTC are illegal or even improper and thus have no bearing on whether Salim is likely to dissipate assets. In short, defense counsel explains: Salim "has had a successful business. There are times when, as in the E*Trade accounts, he put money into the company, and there are times when he has taken money out of the company, but there is nothing wrong with that. There's nothing wrong with writing checks to cash. There's nothing wrong with paying yourself. He has done that. There is nothing wrong with that whatsoever." (Tr. (May 16, 2011) at 60:18-24).

Having carefully considered the public and private interests implicated, the Court finds that the aspect of its May 2, 2011 TRO directing an asset freeze and the appointment of a temporary Receiver should be modified for several reasons. First, the Court finds that Plaintiff's proofs of Defendants' financial impropriety do not, as a general mater, rise to the level of those instances where courts have found a likelihood of dissipation of assets. See, e.g., Johnson v. Couturier, 572

23

F.3d 1067, 1085 (9th Cir. 2009) (finding likelihood of dissipation of assets where defendant had convinced his fellow directors and trustees to consent to diverting nearly $35 million from the company's account into his personal bank account). Secondly, the FTC does not dispute that, in isolation, many of the factors set forth above are neither improper nor illegal. Nevertheless, the FTC urges the Court to consider the combination of all factors "beginning with the deceptive conduct in the first instance." (Tr. (May 16, 2011) at 45:8-9). Although the Court agrees that consideration of the totality of the circumstances is generally relevant in this context, the Court disagrees that any of the specific acts of impropriety raised by the FTC – either singly or in combination – demonstrate a likelihood that Defendants will dissipate any assets.

For instance, although the FTC has presented some evidence suggesting that Defendants, at times, may have disregarded the corporate form, the acts of alleged impropriety here appear to be isolated in nature and, without more, do not demonstrate a history or pattern of deceptive or fraudulent conduct by Defendant Salim. See, e.g., First Financial Group of Texas, 645 F.2d at 438. Moreover, there has been no showing at this juncture that either Defendants' disregard for the corporate form or the underlying deceptive conduct at issue in this case – deception by virtue of failure to adequately disclose fees that reduce the value of the calling cards – was intentional. See Freecom Commc'ns,, 401 F.3d at 1202 (noting that in order to establish liability under Section 5(a), the FTC need not prove that the misrepresentation or omissions were made with the intent to deceive or in bad faith); see generally FTC v. Verity Intern., Ltd., 443 F.3d 48, 63 (2d Cir. 2006) ("[I]t is enough that the representations or practices were likely to mislead consumers acting reasonably."). Finally, the Court finds that many of the concerns raised by the FTC, while valid, can be properly addressed by imposing less drastic measures. Such measures could still result in the proper

24

safeguarding of all available assets for any future consumer redress, the continued verification that Defendants' marketing materials are modified so as to be in compliance with the Federal Trade Commission Act,  while at the same time allowing Defendant Salim's reintegration into the day-to-day operations of the Millennium companies, as well as some access to his personal assets.

In light of the foregoing, the Court finds that a balance of the equities weighs in favor of modifying the asset freeze and appointment of temporary Receiver currently in place.  Based upon this finding, the Court hereby directs the Receiver to submit a proposal to the Court for a plan of transition by which his role can be converted into the role of a monitor and by which the Court's goals – of (1) preserving all available assets, (2) ensuring the continued operation of the Millennium companies in a manner that is profitable and compliant with the law, (3) reintegrating Defendant Salim into the day-to-day operation and management of the Millennium companies, and (4) providing Defendant Salim with some access to his personal assets – can be achieved and maintained, with all necessary safeguards in place, during the pendency of this litigation.  The Receiver shall submit such proposal for the Court's consideration **on or before July 28, 2011.**

## CONCLUSION

Based on the reasons set forth above, the FTC's motion for a preliminary injunction is granted in part.  In particular, the Court finds that the FTC has demonstrated a likelihood of success on the merits as to Count Two of its Complaint – deception by virtue of failure to adequately disclose fees that reduce the value of Millennium's calling cards, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  The Court also finds, however, that a balance of the equities weighs in favor of modifying the specific relief sought by the FTC.  Accordingly, the parties are directed to submit

proposed curative language for use on Millennium's calling cards and other point-of-sale materials on or before July 25, 2011.  The Court requests that the Receiver file a recommendation concerning the parties' proposals on or before July 28, 2011.  In addition, the Receiver is directed to submit, for the Court's consideration, a proposed plan of transition by which his role can be converted into the role of a monitor and by which the Court's goals, as set forth above, can be achieved, in a prudent and orderly fashion, during the pendency of this litigation.  Such proposal shall also be submitted to the Court on or before July 28, 2011.

An appropriate Order accompanies this Opinion.


/s/ Jose L. Linares
Dated: July 11, 2011                    Jose L. Linares
                                        United States District Judge